jyDOUCET, Chief Judge.
The Plaintiff, Alton Froisy, appeals the dismissal of his claim for damages arising out of medical malpractice and false imprisonment.
On April 1, 1995, Froisy’s wife of forty-eight years, Rena Froisy, had the assistant coroner for Iberiá Parish, Dr. Gerald Elias, issue an Order for Protective Custody by alleging that her husband was an alcoholic and physically abusive to her. Pursuant to the order, Froisy was taken into custody by officers of the Iberia Parish Sheriffs Office and taken to Vermillion Hospital where he remained for three days before being released. On July 2, 1997, the Plaintiff filed suit against Dr. Samir Salama, among others. In his petition, he alleged that Dr. Salama, his wife’s psychiatrist, gave false information to Dr. Elias which caused him to issue an Order for Protective Custody.
After hearing the evidence, the court dismissed Froisy’s claim finding that he had failed to carry his burden of proof. Froisy appeals asserting one assignment of error:
The trial judge erred in failing to find that the defendant/appellee committed medical malpractice which resulted in the plaintiff/appellant being wrongfully imprisoned and suffering damages as a consequence thereof.
In a medical malpractice action, the plaintiff has the burden, pursuant to La. R.S. 9:2794(A), of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by | ¡.physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
It is undisputed, having been confirmed by her psychiatrist and her daughter, that, *1246 at the time the Order was issued and for a considerable number of years previously, Rena Froisy had suffered from a mental illness diagnosed by Dr. Salama as bi-polar disorder. The Plaintiff alleges that Dr. Salama breached the standard of care by giving incorrect information to the assistant coroner. At the hearing, Dr. Elias testified that on April 1, 1995, Rena Froisy asked him to issue an order for protective custody (OPC) for her husband, Alton Froisy. He explained that “an order for protective custody is a legal document that guarantees that any person can ask that someone be detained briefly for an evaluation for mental competency.” He further explained that in situations where one spouse asks that an OPC be issued for the other, he asks for corroborating evidence because of the possibility that the request arises from a domestic dispute rather than a real concern as to mental competency. He stated that when he saw Mrs. Froisy he was suspicious and asked for corroboration. She suggested that he call Dr. Sala-ma. He described his contact with Dr. Salama as follows:
Initially, I told him what the situation was, and he understood, and I told him that we very much might like to detain him for an evaluation, and he said that that was a real possibility. And I think that the complaint was he was being abusive and she said he was an alcoholic. And uh, so I stated those comments to him. And uh, he said that it wasplikely, and that it would probably be prudent to go ahead and detain him. Better safe than sorry.
He further stated that he believed that Dr. Salama told him that Mr. Froisy was an alcoholic. Dr. Elias said that without the information conveyed to him by Dr. Sala-ma he would have looked further for information before issuing an order.
Dr. Salama, a psychiatrist, testified as follows: Rena Froisy was his patient from 1992 through 1996. He was treating her for bi-polar disorder of depressed type. Her disease manifested itself in mood changes. He opined that a person with this disorder might appear to others to be vindictive. He admitted that he only met Mr. Froisy once or twice in passing but that Mrs. Froisy told him and the staff at the hospitals where she has been treated that her husband was an alcoholic and was mentally and physically abusive to her. Dr. Salama admitted that he had no personal experience of this type of behavior in Mr. Froisy. He stated that when contacted by Dr. Elias regarding the issuance of the OPC, he told Dr. Elias that: “[T]hrough my work relationship with Ms. Rena Froisy that we had a knowledge by herself that he has been verbally as well as mentally and physically abusive to her, and she had conveyed a history that he has a history of alcoholism as well.” He admitted that he did not tell Dr. Elias about Mrs. Froisy’s mental condition and stated that he could not recall whether he told Dr. Elias that Mrs. Froisy was his patient but assumed that Mrs. Froisy had supplied that information. Dr. Salama alleges that Dr. Elias did not ask whether he knew Mr. Froisy personally, and that he did not volunteer the information.
Dr. James Blackburn, who served on the medical review panel, also testified at trial. When asked whether the standard of care in this medical community would |4have required that Dr. Salama convey Mrs. Froisy’s mental state to Dr. Elias, he replied: “No, not required, not expected.” With regard to whether it was appropriate for a doctor to provide information without personal knowledge, Dr. Blackburn stated:
If the coroner or an individual issuing an OPC inquired as to what information you have, as long as you’ve made it clear that this was information, as in this case, from another person, and didn’t state that I know the person you’re going to do the OPC on. He’s a patient of mine, etc. So to convey information that has been conveyed to you, which frequently happens in my situation where the family, concerned others, call and give their version of the story, if you will, is not in violation of medical practice. It’s just not normally requested by the coroner. *1247 I can’t remember getting a call from a coroner about an OPC asking whether or not I thought it was appropriate to issue.
Dr. Charles Boustany, coroner for the Parish of Lafayette, testified via deposition. With regard to the issuance on OPCs, he stated: “If they have a person that comes in that appears to be reliable and competent, then the coroner yvill evaluate their statements and their — so I don’t think Dr. Elias could refuse this type of OPC. He would let the physician in the hospital make the next decision as to whether that person — and then, if the physician in the hospital is still questionable, then they can do a PEC and throw it on the coroner, which is probably what happened.”
The Froisy’s daughter, Linda Marshall, also testified. She affirmed that her mother had been mentally ill for as long as she could remember and that the illness took the form of bizarre behavior. She stated that her mother had threatened to have her father sent away many times, and had tried to get him to commit himself. Marshall stated that her father would drink two or three beers while watching a ball game, but had not seen him drunk except on one occasion thirty-two years previously. She testified that she had never seen her father physically abuse her mother. She ^stated that she never felt that her father was mentally abusive of her mother, saying: “I’ve always felt it was the other way around.”
After hearing the evidence, the trial judge ruled making the following statements:
The plaintiff in this case bears the burden of proof by a preponderance of the evidence; that is to say, that his version of the facts are more likely to have happened than what the defendant’s version of the facts are. That that version of that conversation with these two doctors occurred in the way that he said it did. I find there is a failure to meet that proof. There is no corroboration, no circumstantial evidence that would lead me to believe that Dr. Salama is not telling the truth. And therein lies the case, what is remaining of the case.
Because I think the plaintiff was poorly treated here and humiliated; and yet, I don’t find the people who I think might be responsible on another trial to be in this lawsuit. And I can tell you just by way of dicta, and I’m sure I haven’t heard the other side of it, but had the coroner’s office or even Mrs. Froisy, who is not, who started all this and who bears responsibility, whether she is mentally capable or not, is a party to this suit, and she should be held responsible for her part in this regardless of her mental condition; because, civil liability does not take into account mental condition as does perhaps the criminal courts.
And Dr. Salama, at this point, for some reason thought this was a very minor thing. And the question about whether he interviewed the plaintiff at the Vermilion Hospital or not, again we don’t have the nurses, the witnesses who were there who can verify that that did not happen, which would attack the credibility of Dr. Salama. So I’m not taking Dr. Salama’s word or Mr. Froi-sy’s word so much as there is a lack of proof here.
And clearly, clearly, we have the interplay of Louisiana Revised Statute 28:63(0 which says “that any person who acts in good faith to assist in the apprehension to take into effective custody and examination of a patient will not be subject to civil and criminal penalties.” I don’t have to go there to see whether that applies; because, I found that there’s a failure of the standard of proof.
After reviewing the evidence of record, this court too finds that there is a failure of proof. The Plaintiff has failed carry his burden of proving the standard of care required of physicians involved in Dr. Sala-ma’s specialty, as well as whether Dr.
*1248 | ^Salama failed to adhere to this standard. Accordingly, we find no error in the trial court’s decision to dismiss Mr. Froisy’s claim.
The judgment of the trial court is affirmed. Costs of this appeal are to be paid by the Plaintiff^Appellant.
AFFIRMED.
PETERS, J., concurs and assigns written reasons.